**BARTON LLP**
**JUDGE MARRERO**                    **13 CV 4468**
Roger E. Barton (RB4142)
Jessica M. Jimenez (JJ7404)
420 Lexington Avenue
New York, NY 10170
Tel: (212) 687-6262
Email: rbarton@bartonesq.com
jjimenez@bartonesq.com
*Attorneys for Plaintiff*

**RECEIVED**
**JUN 27 2013**
**U.S.D.C. S.D. N.Y.**
**CASHIERS**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

DOUGLAS FERGUSON

              Plaintiff,

       -against-

MATTHEW FERRANTE, individually, and
AURORA INFORMATION SECURITY & RISK,
LLC, a New York limited liability company,

              Defendants.

**COMPLAINT**

Plaintiffs Douglas Ferguson ("Plaintiff" or "Ferguson"), by his undersigned counsel, hereby alleges as follows based upon knowledge with respect to his own actions and based upon information and belief with respect to the actions of others:

### NATURE OF ACTION

1.  This is an action for breach of a settlement agreement, breach of contract, fraud, misappropriation of proprietary information and materials and an injunction. Defendant Matthew Ferrante ("Defendant" or "Ferrante") defrauded Ferguson into contributing his financial resources, contacts, know-how and intellectual property which he used to create, develop and launch an information security business known as Aurora Information Security & Risk, LLC ("Defendant or "Aurora"), without keeping his promise to Ferguson that they would jointly own and profit from Aurora. Moreover, based upon Ferrante's false representations that Aurora was to be jointly owned, Ferguson left his lucrative and

promising career at Barclays to work full-time for Aurora.  Despite Ferguson's contribution to Aurora, including generating multiple large scale clients, Ferrante breached his agreement with Ferguson by refusing to admit Ferguson into Aurora as an equity member. Aurora, controlled by Ferrante, also refused to repay Ferguson for his capital investments, refused to share a percentage of the revenue generated by Aurora from Ferguson's contributions and refused to pay him for the time he spent working for Aurora.  Ultimately, Ferguson and Aurora entered into a settlement agreement dated January 12, 2012 (the "Settlement Agreement"[1]), which Aurora then breached.  This action seeks to enforce the terms of the Settlement Agreement, further seeks to recover from Matthew those damages he caused Ferguson to sustain by fraudulently inducing him to leave his position at Barclays, further still seeks a declaratory judgment regarding ownership rights of materials that Ferguson created and damages for Defendants' misappropriation of such materials, and seeks to enjoin Defendants from continuing to use materials that Ferguson created.

## PARTIES

2.  Plaintiff Ferguson is an individual with an address at 16 Leather Lane, Flat 3, London, EC1N 7SU.

3.  Defendant Matthew is an individual with an address at 49 Countrywood Drive, Morris Plains, NJ 07950.

---

[1] Plaintiff notes that paragraph 20 of the Settlement Agreement sets forth that "[t]he parties agree and acknowledge that the terms of this Agreement shall remain confidential and shall not be disclosed to third parties, except … in order to enforce its rights hereunder…"  Further, paragraph 13 of the Settlement Agreement states that "[i]n the event of litigation, a copy of this Agreement may be filed as a written consent to jurisdiction."  In an excess of caution Plaintiff has not attached a copy of the Settlement Agreement to this Complaint.  Plaintiff will provide a copy of the Settlement Agreement in discovery and upon request of the Court.  Plaintiff reserves the right to raise any provision, term or other language in the Settlement Agreement in the course of this lawsuit to enforce Plaintiff's rights thereunder, including any defenses or counterclaims that may be made by Defendants.

4.   Defendant Aurora is a New York limited liability company having a principal place of business at 45 Rockefeller Center, 20th Floor, New York, NY 10111.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over the subject matter of Ferguson's claims pursuant to 28 U.S.C. §1332 in that complete diversity of citizenship exists between Ferguson and defendants, and the matter in controversy, exclusive of interest and costs, is well in excess of $75,000.

6.   Jurisdiction is proper over Defendant Ferrante in this Court because (a) the action is based on Ferrante's involvement concerning the activities of Aurora, a New York limited liability company; and (b) upon information and belief, Ferrante conducts business on behalf of Aurora in New York.

7.   Jurisdiction is proper over Defendant Aurora because it is a New York limited liability company.

8.   Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a) in that a substantial part of the property that is the subject of the action is situated in this District, many of the relevant events involved in this action occurred in this District and Aurora operates as a New York limited liability company.   Further, venue is proper because paragraph 13 of the Settlement Agreement provides that the parties consented to the "exclusive jurisdiction of the federal and state courts located in the State of New York and County of New York for the resolution of any disputes that arise out of relate to [its terms]."[2]

---

[2] *Id.*

## RELEVANT BACKGROUND

**I.   Ferguson is a Leading Expert in the Information Security Industry**

9.   Ferguson has been a professional in the information security industry since 1994. His expertise in the information security industry derives from his service with the Royal Canadian Mounted Police, Milkyway Networks, Internet Security Systems, IBM and Barclays, among others.  Ferguson has personally delivered his services to over 100 clients globally, including many Fortune 500 companies in the financial, retail, pharmaceutical, transportation, insurance and energy industries.

10.   Ferguson's reputation in the industry and his vast expertise in areas such as (a) security governance, (b) network, systems and application security, (c) penetration testing, red teaming, threat, impact, vulnerability and risk assessment, (d) security control design and operation, (e) security of critical infrastructure and (f) integrated defense-in-depth security control frameworks, make him a leading expert in his field, a sought after panelist at conferences involving information security, a coveted member of the elite security research division X-Force and a valuable resource to any company that utilizes his abilities.

**II. Barclays Retains Ferguson and Grooms Him for a Senior Leadership Position**

11. In 2008, Barclays Bank (London) hired Ferguson as its head of Penetration Testing. Within a year he was promoted to add to his title, "Head of Firewalls," and within two years he was promoted yet again to add to his position, "Head of Security Controls Assessment and Account Executive," for various other areas.  With each promotion Ferguson received a sizable cash bonus, which was especially noteworthy considering the financial climate for banks at the time during which these bonuses were awarded.

12.  Ferguson's quick rise through the ranks at Barclays positioned Ferguson for a long and profitable career with the bank, and, in fact, Ferguson's superiors informed him that he was being groomed to take a senior leadership position at Barclays in its security group.

13.  Ferguson's commitment to develop a long and mutually-beneficial relationship with Barclays London was also evidenced by the fact that Ferguson, a Canadian national, applied to become a citizen of the United Kingdom.  Ferguson had invested heavily in his career and was prepared to invest further in order to continue on his path to success with Barclays.

### III. Ferguson Meets Defendant Ferrante, who Induces Ferguson to Leave Barclays for Aurora

14.  In or around 2008, Ferguson met Ferrante (a former Secret Service agent) at Barclays Bank in London.  Ferguson and Ferrante were retained by the bank to build and lead global information security programs based on their respective areas of established industry expertise.  Ferguson provided expertise in penetration testing, red teaming, security control and strategy and Ferrante provided expertise in cyber-forensics and investigatory work.

15. In or around December 2008, while Ferguson and Ferrante were on assignment for Barclays in Dubai, Ferrante suggested to Ferguson that they would make a good team, alluding to a business relationship that was to ensue in the future.

16. In or around March 2010, while both Ferrante and Ferguson remained employed by Barclays, Ferrante approached Ferguson about leaving the bank in order to co-found a company together.

17. Unbeknownst to Ferguson, in 2009 Ferrante had his wife, Diana, form a New York limited liability company, Aurora Consulting Experts LLC, later renamed "Aurora Information & Security Risk LLC" in 2010.  Upon information and belief, Ferrante had Diana form the company on his behalf while he was still employed at Barclays in order to

circumvent his obligations under certain with Barclays. Also upon information and belief, Ferrante intended to use the company for a business he would form once he found a "partner" to invest in it.  Thus, Ferrante did not meet Ferguson and then decide to form a company; rather, he had been concocting a plan to find the right person to invest in *his* company at the time he proposed that he and Ferguson go into business together.

18. On or about May 8, 2010, Ferrante and Ferguson had a meeting at the Radisson Blu Edwardian New Providence Wharf Hotel, London E14 9PJ, where Ferrante made the following material representations to Ferguson, which Ferrante knew at the time were false, in order to induce Ferguson to embark upon a business venture with him:

    a. Ferrante and Ferguson would each contribute their respective skill and expertise, namely, Ferrante's cyber-forensic and investigatory abilities and Ferguson's penetration testing, red teaming, security control and strategy expertise to build a business together into one integrated model that could be developed for and delivered to corporate clients;

    b. Ferrante and Ferguson would share in the financial investment of the company and the profits as equity partners, and eventually earn a salary of at least what each was making at Barclays;

    c. The enterprise would be created to have a fixed US and UK presence from the outset of its operations;

    d. Ferrante and Ferguson would each have access to the books and records of the business;

    e. Minimal investment was needed from Ferguson for the business, since Ferrante had already created the foundation of the business.

19. Ferrante followed up that meeting with an email to Ferguson dated May 8, 2010 entitled, "Aurora Meeting & Action Items" that outlined the various tasks that he envisioned the two would work on together in order to launch the business operations.  It specifically assigned tasks including overall strategic design, project plans and web design to Ferguson. It also referenced both Ferrante and Ferguson as the "High Level Risk Takers" for the business and noted that they would have to determine a salary for each Ferrante and Ferguson.  A true and accurate copy of that email is annexed hereto as **Exhibit 1[3]**.

20. In or around early June 2010, Ferguson and Ferrante met again at the Italian restaurant in the atrium of Exchange Tower, Harbour Exchange Square, London E14 9GE, at which meeting Ferrante falsely represented to Ferguson that, should Ferguson agree to go into business with Ferrante, Ferguson would receive a 40% equity interest in the company (60% would be attributed to Matthew) and a salary of £100,000.

21. At the time Ferrante made the aforementioned representations to Ferguson on May 8, 2010 (in person and by e-mail) and again in the meeting in early June 2010, he knew those representations were false and that Ferguson would rely upon them.  Ferrante made those false representations to induce Ferguson to leave Barclays and to contribute his expertise, financial resources and time into the development of a new business that Ferrante wanted to create.

22. Based on Ferrante's ongoing fraudulent representations to Ferguson, Ferguson resigned from Barclays in June 2010.  He thereafter joined Ferrante in his business endeavor and began delivering his services and expertise to Aurora.

---

[3] Plaintiff notes that any and all copies of emails that are otherwise subject to the terms of the Settlement Agreement are disclosed herein for purposes of enforcing Plaintiff's rights thereunder and reserves the right to disclose additional email exchanges in the course of discovery of this litigation for the same purpose.

**IV. Ferguson and Ferrante Begin to Create Aurora's Business as Co-Founders**

23. At the outset of his relationship with Aurora, Ferrante and Ferguson agreed that Ferguson would hold the title of "managing director and co-founder" of Aurora and Ferguson and Ferrante agreed upon an initial salary equal to Ferguson's base annual salary at Barclays in the amount of £100,000 (approximately $150,000).   Ferrante agreed to take the same salary and offered to use the Aurora company.

24. On July 12, 2010, Ferrante emailed Ferguson in response to Ferguson's concerns about the cost of starting the business in an email entitled, "business costs" in which Ferrante represented to Ferguson:

> Doug,
>
> You have my support, dedication and loyalty for the business.  Almost all of this I have covered.  It is almost ready to launch.  We just need the wording to put into the final ink.
>
> Best,
> Matthew

A true and accurate copy of the July 12, 2010 email chain with Ferguson is annexed hereto as **Exhibit 2**.

25. Also in July 2010, Ferguson began developing Aurora's website with Ferrante's ultimate approval on all content.  The website (as well as the business cards Ferrante sent to Ferguson) clearly indicated that Ferguson was a co-founder and managing director of the company.  A true and accurate copy of that website screenshot and business card are annexed hereto as **Exhibits 3** and **4,** respectively.  The website also began to delineate the types of services and products available to Aurora clients.

26. While Ferguson produced resource, cost and revenue forecasts, delivered the initial Aurora start up project plan, drafted the website content and an initial frameworks slide deck,

Ferrante, in turn, provided a very skeletal outline of the business plan, which referenced Ferguson as "Managing Director and Co-Founder." Woefully missing from this bare bones outline was any mention of Ferguson or Ferrante's equity interest, capital contribution, the company's management structure or any other substantive element of the prospective business operations.

27. In a Skype session between Ferrante and Ferguson on August 9, 2010, Ferrante and Ferguson discussed having Ferguson's name incorporated as a partner or a member of Aurora in its legal documents. Specifically, excerpts of the Skype exchange are as follows:

> Matthew: let me start with the legal paperwork to send you
> Douglas Ferguson: ok, great
> …
> Matthew: then I will ask for a quote to have you added as a partner
> Matthew: we can still do this as an LLC
> …
> Douglas Ferguson: … regardless of our stock options – if you [sic] name isn't on the license you are at a disadvantage
> Matthew: well; we get you added as a member

A true and accurate copy of the Skype exchange is annexed hereto as **Exhibit 5**.

28. On August 10, 2010, Ferrante emailed Ferguson to indicate that the legal documentation of their arrangement was moving forward by noting "I have a quote to edit the AISR LLC partnership agreement at $1,500. … At a minimum, they are reserving the name 'Aurora Information Security & Risk' & 'Aurora CFI/e-Discovery.'" A true and accurate copy of Ferrante's August 10, 2010 email is annexed hereto as **Exhibit 6**.

29. Ferrante continued to defraud Ferguson by repeatedly misrepresenting that the two were going to work with lawyers to finalize the terms of their business deal in an operating agreement, further inducing Ferguson to contribute his talent to the company but knowing full well that he would never reach a final agreement with Ferguson. In fact, Ferrante

discouraged Ferguson from even retaining separate counsel to negotiate the document, reassuring Ferguson that his counsel would represent them both.

30. Despite an ongoing request by Ferguson to finalize the legal documentation of the business arrangement before he and Ferrante continued to proceed with work for the company, Ferrante never had the agreement finalized and no such LLC agreement was ever signed.

31. Despite his representations to the contrary, Ferrante never had any intention of entering into a final LLC agreement with Ferguson concerning Aurora. Rather, Ferrante intentionally manipulated Ferguson to create the Aurora operational foundations, service model and other items, as well as invest his human and financial capital and leverage his reputation and contact base to benefit Aurora, without any intention of allowing Ferguson to share in the revenue stream he created. The course of conduct that ensued between Ferguson and Ferrante confirms that Ferrante engaged in a fraudulent scheme to induce Ferguson to enable Ferrante and Aurora to profit for Ferrante's sole benefit.

**V. Ferguson Invests in and Develops Aurora based on Ferrante's Continued False Representations**

32. Notwithstanding the lack of a formal signed agreement between Ferguson and Ferrante, Ferrante generated purported budgets for Ferguson to review and fund for purposes of continuing the business. These "budgets" were unsubstantiated by any real proof of costs or proposals for work but rather were created for Ferrante to cause Ferguson to invest more money into the business. An example of such an email exchange took place on November 24, 2010, in which Ferrante agreed to accept Ferguson's personal funds – which ultimately resulted in Ferguson's contribution of $14,000 - to cover what Ferrante represented to be upcoming expenses between $20,744 and $28,184. A true and accurate copy of that email

exchange on November 23, 2010 and 24, 2010 is annexed hereto as **Exhibit 7**.  Despite his contribution, Ferguson was not provided with proof that Ferrante contributed the same or any amount into Aurora nor was Ferguson provided with access or proof of payment of the items for which Ferrante sought Ferguson's financial contribution in November 2010.

33.  Additionally, Ferguson continued to develop products and services for Aurora.  For example, his efforts were instrumental in the development of various services, including e3 Red team, e3 Pulse, Aurora Protection Assurance and Aurora Phoenix - all special service products that Ferguson created which Aurora continues to use and market to the public today. In fact, Aurora has described the products that Ferguson created for the company in its trademark and servicemark applications with the United States Patent and Trademark Office. Further, Ferguson led the development of Aurora's website, he created marketing materials for the company to use, he prepared business proposals, finance spreadsheets, growth forecasts, payment processes, business policies and standards.  Essentially, Ferguson created and developed substantially all the products and services to be used by Aurora.

34.  Ferguson lent considerable expertise that gave Aurora a strategic advantage over any potential competitor.  The products and services that Ferguson developed for Aurora were developed in reliance upon Ferrante's representations to Ferguson that he was to be a co-founder and 40% owner of Aurora.

35.  Throughout 2010 and 2011, Ferguson embarked on numerous self-funded attempts to generate business for Aurora, believing he was a co-founder, including:

> (a) July 2010 – BlackHat Information Security Conference in Las Vegas;

> (b) January 2011 – trip to New York City to meet a potential business partner;

(c) February 2011 - trips to New York City to pitch Aurora's services to a hedge fund, a trip to San Francisco to attend a conference at which Ferguson would market Aurora;

(d) April 2011 – trip to New York City to pitch Aurora's services to various insurance and car rental businesses;

(e) May 2011 - trip to Lisbon to pitch to a communications company, trip to New York City to pitch Aurora's services to a life insurance company;

(f) June 2011 – trip to New York City to promote Aurora at a conference where he was the keynote speaker and to meet and pitch Aurora's services to a security company; and

(g) August 2011 – various trips to San Francisco and New York City for an insurance case, as specifically requested by Ferrante.

36.  During this time, Ferguson spent approximately $9,000 on his efforts to promote a business he was made to believe he was a co-founder of and for which he would be remunerated accordingly.

**VI. Ferguson Generates Aurora Business, Builds Relationships and Services Client Needs**

37. Relying on Ferrante's continued fraudulent representations, Ferguson dedicated 100% of his efforts to Aurora.  Ferguson's efforts were fruitful for the business in that he secured various contracts and began to develop strategic relationships for its future growth, including the following:

(a) Partnered with several UK companies for expert resources (Hudson and Info-Assure, among others);

(b) Indian firm was secured for future business needs;

12

(c) 3 American partners were secured (ClearSkies, Securisea, RedLegg);

(d) South African partner was secured for future business needs;

(e) proposals for business were sent to various companies including a bank, petroleum company, credit card company, electronics company and a political campaign;

(f) McAfee retained the company's services and Ferguson's efforts generated substantial revenue for Aurora;

(g) Accuvant retained the company's services and Ferguson's efforts generated revenue for Aurora; and

(h) RedLegg retained Aurora.

38.  By the end of 2011, Ferguson's efforts alone generated approximately $200,000 in gross revenue for Aurora.

39.  Further, Ferguson spent his own money to pay for contractors used to assist with Aurora-related projects, travel expenses and marketing endeavors to launch the Aurora business.

**VII. Ferrante and Aurora Refuse to Open UK Business**

40. Among the various false representations that Ferrante made to Ferguson in order to induce him to leave his employment with Barclays and invest his resources, know-how and time into Aurora was Ferrante's representation that there would be a United Kingdom portion of the business that Ferguson would oversee.  Since the inception of their discussions in 2010, Ferguson made clear that it was an absolute condition to his agreement to any potential business relationship that there be a UK presence for the business at the outset.  Since Ferguson was in the process of becoming naturalized as a British citizen, it was critical for

his business operations to remain within the UK.  Further, many UK-based businesses that Ferguson encountered required contracting directly with another British-based company.  In turn, Ferrante continually emphasized, from 2010, that there would be an immediate UK presence for the company.  Ferrante knew that his representation to Ferguson that there would be an immediate UK presence was absolutely material for Ferguson.  Nevertheless, after repeated requests and demands, Ferrante failed to take any action towards the formation of a UK presence for Aurora and actively prevented Ferguson from moving forward with any attempts to form a UK company or otherwise establish a UK presence for Aurora.

41. Despite Ferguson's efforts to form the UK-side of Aurora's business from as early as 2010, when Ferguson tried to get Ferrante's consent to forming the company so that he could hope to solidify UK-based leads for new business, Ferrante repeatedly made excuses as to why a UK presence was not yet appropriate for the business, including:

    a.   There were limited resources to deliver UK business;

    b.   Corporate formation should come after the operating agreement was finalized for the US-based business, despite deliberately failing to complete the negotiation and legal drafting of that document;

    c.   Simply refusing to form a UK business and dismissing the urgency of the process when Doug raised it with him.

42. All of Ferrante's excuses were directly contradictory to his knowingly false representations to Ferguson in May and June 2010 that there would be a UK presence and company from the beginning of Aurora's operations.  Ferrante knowingly made those false representations in May and June 2010 to further induce Ferguson to leave Barclays and join

Aurora.  Ferguson did rely upon Ferrante's material representations in deciding to leave Barclays in order to work as a co-founder of Aurora.

43. Throughout 2010 and 2011, Ferguson made contacts with prospective clients in the UK and elsewhere throughout Europe, yet he could not secure the business because, among other reasons, there was no UK company, no UK bank account (because there was no UK company), Ferrante refused to provide Ferguson with UK-based Aurora pricing information to use for proposals to submit to prospective UK/European business, despite Ferguson's repeated request and, hence, Ferrante prevented Ferguson from solidifying any UK-based business.

**IX. Ferrante and Aurora Refuse to Pay Ferguson Salary, Share Profit or Show Books**

44.  Ferrante's failure and refusal to deliver on the promises he made to Ferguson in the spring and summer of 2010 were exactly as Ferrante planned all along.  Ferrante had total control of Aurora's books, records, bank accounts and expenditures, he had a direct line of communication with its graphic artists, attorneys and other important advisors, while Ferguson was across an ocean with no visibility into the company operations. Ferrante continued his scheme to induce Ferguson to build a client base, marketing materials, connections and a good company reputation, among other things, without any immediate commitment by Aurora to pay Ferguson what Ferrante represented to him in 2010.

45. Furthermore, Ferguson was never paid the salary that he and Ferrante had previously agreed upon for his work at Aurora and he never shared in the revenue he generated for the company.

46. When Ferguson demanded payment for his efforts, an operating agreement that confirmed his entitlement to a portion of the revenue, ownership rights and voting rights of

Aurora, Ferrante stalled and stated he would provide them but he never did.  When Ferguson asked to review the company's finances, Ferrante said he would get the information to Ferguson but ultimately he made excuses and ultimately never provided access to those records.

47. For example, on or about October 19, 2010, Ferguson requested that Ferrante provide him with a balance sheet for the company.  Ferrante responded by stating that he will provide it in one week but he never did.

48. On or about December 3, 2010, Ferguson requested that Ferrante provide him with company operating expenses and capital expenditure figures.  Ferrante responded by stating that he will provide them in one week but he never did.

49. At various times throughout 2011, Ferrante alluded to or directly represented that Aurora had revenue – independent of revenue that Ferguson generated - of up to approximately $90,000, yet the detail behind that representation was never shared with Ferguson nor was any portion of that purported $90,000 paid to him.

50. Since Ferguson had no access to Aurora's bank account in the United States and since Ferrante continued to stonewall Ferguson by refusing to provide any information that might have given him a better understanding of the company's finances at any particular time, Ferguson was unable at any time to verify Ferrante's representations about Aurora's revenue.

51. On or about August 23, 2011, in response to Ferrante's request for another capital infusion from Ferguson, Ferguson asked for support to show why the additional money was needed.  By that time, Ferguson had already invested over $30,000 of his own money into the business and had not seen a cent of it returned to him.  Ferrante responded that day by stating that if Ferguson was not going to make an investment and take risk then he was not entitled

to share in the business – a business of which he was already supposed to be a 40% owner. A true and accurate copy of the August 23, 2011 email chain between Ferguson and Ferrante on the issue of finances and partnership commitment is annexed hereto as **Exhibit 8**.

52. Consistent with Ferrante's fraudulent scheme to lure Ferguson further into a position where he invested time, money and other resources into Aurora based on Ferrante's false representations that Ferguson would have a 40% equity interest in the company and other items, Ferrante continued to promise information he previously represented he would provide to Ferguson but he never did.  Ultimately, Ferrante never formalized an agreement that reflected Ferguson's equity in Aurora, he never acted to solidify the company's UK presence as Ferguson repeatedly requested, he never provided Ferguson insight into the company's books and records and he never caused Aurora to pay Ferguson for his efforts.

**X. Once Aurora is About to be Paid by its First Big Ferguson-Generated Client, Ferrante Cuts Ferguson Out Entirely**

53.  By the fall of 2011, Ferguson had invested time, money and effort into the Aurora business for over a year with no return on investment, and Ferguson was still not formally an equity partner of Aurora.  After continuously being disappointed by Ferrante's curious lack of response to his repeated requests for a document to memorialize the terms of their partnership, Ferguson approached Ferrante in the fall of 2011 with a demand for payment knowing that McAfee was about to tender payment for work that Aurora (*e.g.*, Ferguson and contractors he paid for) performed for it.  Ferguson was the person that directly serviced (approximately 400 hours), resourced and managed the team and paid for expenses out of pocket on this particular project.

54. In or around September and October 2011, at Ferguson's insistence that he be paid something from the Aurora account once the McAfee fees were paid to the company, Ferrante's wife, Diana, who was acting as the company's Director of Finance, confirmed by email that she would notify Ferguson once the McAfee funds hit Aurora's account. The understanding, as corroborated by an email chain between Ferguson and Diana, was that once the monies hit the Aurora account a portion of the fees would be sent to Ferguson. Further, Ferrante confirmed in several emails that Ferguson would be paid for the job once Aurora was paid. While, upon information and belief, McAfee paid Aurora, Ferguson never received money from that payment. A true and accurate copy of the October 4, 2011 email chain between Ferguson and Diana Ferrante and those emails between Ferguson and Ferrante on September 30, 2011 and October 3, 2011 concerning payment are annexed hereto as **Exhibits 9** and **10**, respectively.

55. Rather than share in the success that Ferguson created, on or about September 24, 2011, by telephone conference call with Ferguson, his UK counsel, Ferrante and Ferrante's US counsel, Ferrante refused to acknowledge his representations to Ferguson that he would share in the equity of Aurora. Ferrante further refused to acknowledge the successes of Ferguson's efforts or his entitlement to any portion of the company's revenues, albeit he continued to make general representations about amounts to be paid to Ferguson once Aurora received payment from McAfee. What ensued from that point forward was a lengthy negotiation by Aurora, on the one side, and Ferguson on the other.

56. Finally, in January 2012, after Aurora dragged out settlement discussions, Doug and Aurora finalized the Settlement Agreement whereby Ferguson would be compensated for

some of his out-of-pocket expenses and a portion of the revenue generated through clients he introduced.  Specifically, the Settlement Agreement stated, in relevant part:

> [t]he parties agree to divide net profits from work done for Aurora clients originated by Doug as follows: two-thirds (2/3) for Aurora and one third (1/3) for Doug.  … The parties agree that there will be full and prompt disclosure and transparency of all payments received by Aurora from [clients that Doug originated].  Settlement Agreement, paragraph 5.

> All … payments due and owing to Doug from Aurora under this Agreement shall be made within two (2) business days of the date of receipt by Aurora from the [clients that Doug originated.]   Settlement Agreement, paragraph 7. [4]

57.  McAfee was a client that Ferguson originated, as acknowledged in the Settlement Agreement.  Further, at the time the Settlement Agreement was signed, McAfee owed Aurora a sum of money, of which $22,000 would have been payable to Ferguson under the Settlement Agreement.

58. Under the Settlement Agreement, Aurora was to pay Ferguson approximately $22,000 upon receipt of funds from McAfee and was to have access to any supporting books and records to reflect that Aurora received payments.  Upon information and belief, Aurora received payment from McAfee over a year ago.  Despite having received payment, Aurora has failed and refused to pay outstanding amounts due under the Settlement Agreement in an amount of approximately $22,000.

59.  Further, since the time the Settlement Agreement was signed, Ferguson has learned through various sources that Ferrante has made fraudulent representations that Doug is a representative of Aurora, presumably in order to help him acquire new clients for Aurora, without Ferguson's knowledge or consent.

---

[4] *Id.*  Plaintiff has extracted certain provisions from the Settlement Agreement for purposes of enforcing his rights thereunder and reserves the right to raise other provisions and terms of the Settlement Agreement for purposes of this litigation.

## FIRST CAUSE OF ACTION
### (as against Aurora for Breach of Contract)

60. Ferguson repeats, realleges and reincorporates the allegations of paragraphs 1 through 59 as if set forth in their entirety herein.

61. Aurora and Ferguson entered into a confidential settlement agreement in January 2012.

62. Ferguson performed all his obligations under the confidential settlement agreement in January 2012.

63. As part of the settlement agreement, Aurora was required to pay Ferguson an amount of approximately $22,000 from monies due and owing to him for work performed and delivered for certain clients that Ferguson originated.

64. Despite Ferguson's repeated demand for the outstanding payment, Aurora has failed and/or refused to make the payment.

65. As a result of Aurora's failure and refusal to pay Ferguson the approximate $22,000 under the confidential settlement agreement of January 2012, Ferrante is in breach of the Settlement Agreement and Ferguson is entitled to recover damages in amount of approximately $22,000.

## AS AND IN THE ALTERNATIVE, SECOND CAUSE OF ACTION
### (as against Aurora for Unjust Enrichment)

66. Ferguson repeats, realleges and reincorporates the allegations of paragraphs 1 through 65 as if set forth in their entirety herein.

67. Ferguson performed, delivered and provided professional services on behalf of Aurora for Aurora clients, and Aurora accepted and received the benefits of Ferguson's work without any compensation to Ferguson.

68. Despite Ferguson's repeated demand, Aurora has failed and refused to compensate Ferguson for those services.

69. It would be against equity and good conscience for Aurora to have received the full benefits of Ferguson's professional services without paying Ferguson the full, reasonable value thereof.

70. Therefore, Aurora has been unjustly enriched in an amount to be determined at trial but in excess of $66,000.

<u>**THIRD CAUSE OF ACTION**</u>
**(as against Aurora for an Accounting)**

71. Doug repeats, realleges and reincorporates the allegations of paragraphs 1 through 70 as if set forth in their entirety herein.

72. In accordance with the January 2012 settlement agreement, Aurora was required to pay Ferguson approximately $22,000 upon receipt of funds from certain clients that Ferguson originated for Aurora.

73. Upon information and belief, Aurora has received the payment from its clients that were originated by Ferguson, but it has failed and refused to pay Ferguson the approximate $22,000 due and owing to him despite Ferguson's performance under the terms of the confidential settlement agreement.

74. By reason of the foregoing, Ferguson has been damaged in amount of approximately $22,000 and demands an accounting of Aurora's books and records insofar as they relate to the clients that Ferguson originated during the time in which he was associated with Aurora from 2010 through the present date.

**FOURTH CAUSE OF ACTION**
**(as against Ferrante for Fraud and Fraudulent Inducement)**

75. Doug repeats, realleges and reincorporates the allegations of paragraphs 1 through 74 as if set forth in their entirety herein.

76. On or about May 8, 2010, Ferrante and Ferguson had a meeting at the Radisson Blu Edwardian New Providence Wharf Hotel, London E14 9PJ, where Ferrante made the following material representations to Ferguson, which Ferrante knew at the time were false and were made in order to induce Ferguson to embark upon a business venture with him:

    a.  Ferrante and Ferguson would each contribute their respective skill and expertise, namely, Ferrante's cyber-forensic and investigatory abilities and Ferguson 's penetration testing, red teaming, security control and strategy expertise to build a business together into one integrated model that could be developed for and delivered to corporate clients;

    b.  Ferrante and Ferguson would share in the financial investment of the company and the profits as equity partners, and a salary of at least what each was making at Barclays;

    c.  The enterprise would be created to have a fixed US and UK presence from the outset of its operations;

    d.  Ferrante and Ferguson would each have access to the books and records of the business;

    e.  Minimal investment was needed from Ferguson for the business, since Ferrante had already created the foundation of the business.

77. Ferrante followed up that meeting with an email to Ferguson dated May 8, 2010 entitled, "Aurora Meeting & Action Items" that outlined the various tasks that he envisioned

the two would work on together in order to get the business off the ground, referencing specific tasks assigned to each "partner" and referencing both Ferrante and Ferguson as the "High Level Risk Takers" for the business who would each draw a salary.

78. In or around early June 2010, Ferguson and Ferrante met again at the Italian restaurant in the atrium of Exchange Tower, Harbour Exchange Square, London E14 9GE, at which meeting Ferrante falsely represented to Ferguson that, should Ferguson go into business with Ferrante, Ferguson would receive a 40% equity interest in the company (60% would be attributed to Ferrante) and a base salary of £100,000.

79. Ferrante continued to intentionally make material misrepresentations to Ferguson to induce him to develop the business from June 2010 forward.

80. At the time Ferrante made the aforementioned representations to Ferguson on May 8, 2010 (in person and by e-mail), in the meeting in early June 2010, and from June 2010 forward he knew those representations were false and that Ferguson would rely upon them. Ferrante made those false representations to induce Ferguson to leave Barclays and to contribute his expertise, financial resources and time into the development of a new business that Ferrante wanted to create. At the time that he made such representation to Ferguson, Ferrante knew that he was not going to give Ferguson any interest in any company they developed, nor was Ferrante going to pay Ferguson any amount of salary or other guaranteed payment. At the time that Ferrante made his fraudulent representations to Ferguson, he made them with the intent that Ferguson would rely on them and, in fact, Ferguson did justifiably and reasonably rely on them in resigning from Barclays and promoting and developing a business with Ferrante.

81. Not knowing that Ferrante's representations were intended to defraud Ferguson into committing his full time, efforts, expertise, skill and a substantial amount of money into a business that he would never receive an interest in or salary from, Ferguson relied upon Ferrante's representations and resigned from his position at Barclays that paid him an annual salary of £100,000 and bonuses, with the understanding that he would continue to be paid at least the equivalent of his base salary with the company that he and Ferrante would co-found - in which he would hold a 40% interest.

82. Had Ferrante not made the fraudulent representations to Ferguson about the partnership in Aurora, Ferguson would have not resigned from his position at Barclays.

83. As a result of Ferrante's fraudulent conduct, Ferguson has been damaged in an amount to be determined at trial, but no less than the equivalent of his annual salary and additional benefits he last received at Barclays, from June 2010 forward.

### FIFTH CAUSE OF ACTION
**(as against Aurora and Matthew Ferrante for Misappropriation and Conversion of Trade Secrets and Confidential Business Information)**

84. Ferguson repeats, realleges and reincorporates the allegations of paragraphs 1 through 83 as if set forth in their entirety herein.

85. Ferguson expended considerable time, labor and money to develop trade secrets of the information security business, and specifically that relating to the development of the business that is now Aurora, including the development and mechanics of e3 Red team, e3 Pulse, Aurora Protection Assurance and Phoenix, the website, the creation of marketing materials for the company to use, preparation of business proposals, finance spreadsheets, growth forecasts, payment processes, business policies and standards.

86. Ferguson took reasonable steps to protect the confidentiality of these materials, many of which consisted of Ferguson's own intellectual property, and shared them only with select individuals associated with Aurora for purposes of developing and operating the business, with the understanding that he was a partner of the organization. However, at no point in time did he contribute those trade secrets and confidential business information to Aurora, and at no point in time did assign, license or transfer these trade secrets and confidential business information to Aurora for purposes of its continued business or any purpose whatsoever.

87. Ferrante and Aurora misappropriated and converted Ferguson's files, documents, know-how and data containing the trade secrets and confidential business information Ferguson was fraudulently induced to sharing with them and Ferrante and Aurora are using the trade secrets and confidential business information in the course of Aurora's business operations for Aurora's benefit and in competition with any existing or future enterprise with which Ferguson is associated in the information security industry.

88. As a result of Ferrante's and Aurora's misappropriation and conversion of Ferguson's trade secrets and confidential business information, Ferguson has been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**(as against Aurora and Matthew Ferrante for Declaratory Judgment)**

89. Ferguson repeats, realleges and reincorporates the allegations of paragraphs 1 through 88 as if set forth in their entirety herein.

90. Ferguson expended considerable time, labor and money to develop trade secrets and other confidential business information of the information security business, and specifically that relating to the development of the business that is now Aurora, including the development and mechanics of e3 Red team, e3 Pulse, Aurora Protection Assurance and

Phoenix, the website, the creation of marketing materials for the company to use, preparing business proposals, finance spreadsheets, growth forecasts, payment processes, business policies and standards ("Ferguson's Information").

91.  Ferguson never transferred, assigned or licensed the aforesaid information to Aurora and never authorized the company's continued use of information he created and Ferguson maintains that he is the sole and exclusive owner of Ferguson's Information and, except that, to the extent that any third party made any contribution to any portion of Ferguson's Information, he is the joint-owner of said jointly-created works.

92.  Aurora is currently using Ferguson's Information for its marketing and other business purposes, without authority to do so.

93.  Aurora maintains that it is entitled to Ferguson's Information, yet according to Aurora, Ferguson was not an owner of Aurora.  Nor has Ferguson ever signed any document to license, assign, transfer, or otherwise allow for Matthew or Aurora to use Ferguson's Information.

94.  A legitimate controversy exists among the parties as to the actual ownership rights of Ferguson's Information.

95.  Accordingly, Ferguson seeks a declaratory judgment to determine the ownership rights of Ferguson's Information.

**<u>SEVENTH CAUSE OF ACTION</u>**
**(as against Aurora and Matthew Ferrante for a Permanent Injunction)**

96.  Ferguson repeats, realleges and reincorporates the allegations of paragraphs 1 through 95 as if set forth in their entirety herein.

97.  Defendants are using Ferguson's Information for marketing and other business purposes without Ferguson's consent.

98. Ferguson has suffered, and will continue to suffer, substantial irreparable harm and damage as a result of Defendants' unauthorized use of Ferguson's Information, including loss and/or dilution of his competitive advantage and potential for future business, which harm and damages cannot be accurately ascertained.

99. If Defendants Ferrante and Aurora are not enjoined from continuing to use Doug's Information, they will continue to benefit financially and otherwise from his efforts, substantial expense and personal investment, to Ferguson's detriment.

100. Ferguson has no adequate remedy at law.

101. Accordingly, Defendants Ferrante and Aurora ought to be permanently enjoined from continuing to use and benefit from Ferguson's Information.

**WHEREFORE,** Plaintiff demands Judgment in its favor against Defendants Matthew Ferrante and Aurora as follows:

A. in favor of Douglas Ferguson against Aurora for breach of contract in an exact amount to be determined at trial in an amount of $22,000, plus interest at 9% from the date of Aurora's breach;

B. in favor of Douglas Ferguson against Aurora for unjust enrichment in an exact amount to be determined at trial;

C. in favor of Douglas Ferguson and against Aurora for an accounting of Aurora's books and records concerning all Aurora clients that Douglas Ferguson originated for Aurora from 2010 through the present;

D. in favor of Douglas Ferguson in an amount to be determined at trial but no less than Doug's annual salary at Barclays from June 2010 to trial because Defendant Matthew Ferrante defrauded him into resigning from Barclays;

E. in favor of Douglas Ferguson against Matthew Ferrante and Aurora for damages incurred in connection with Defendants' misappropriation and conversion of Ferguson's trade secrets and confidential business information;

F. a declaratory judgment in favor of Douglas Ferguson that confirms Ferguson's Information belongs to Ferguson and should not be used by Aurora or Matthew without proper authority and payment;

G. a permanent injunction enjoining and restraining Matthew Ferrante and Aurora from using Ferguson's Information for any purpose whatsoever;

H. awarding Plaintiff his costs and disbursements of this action; and

I. such other relief as the Court deems proper.

Dated: New York, New York
      June 27, 2013

**BARTON LLP**

By: _____
Roger E. Barton
Jessica M. Jimenez
*Attorneys for Plaintiff*
420 Lexington Avenue, 18th Floor
New York, NY 10170
(212) 687-6262

# EXHIBIT 1

| | |
|---|---|
| **From:** | Matthew D. Ferrante [mferrante@auroracfi.com] |
| **Sent:** | Saturday, May 08, 2010 12:45 PM |
| **To:** | dferguson@auroracfi.com |
| **Subject:** | FW: Aurora Meeting & Action Items |

**From:** Matthew D. Ferrante [mailto:mferrante@auroracfi.com]
**Sent:** Saturday, May 08, 2010 5:45 PM
**To:** 'Douglas R. Ferguson'
**Subject:** Aurora Meeting & Action Items

Aurora Information Security & Risk, LLC

1. Email Account: Created (Call for Password)
2. Overall Strategic Design – Doug & Matthew
3. Business Buckets / Silos, i.e. Product & Service Offerings.
4. High Level Risk Takers & Salary Requirements (Matthew & Doug) v '1099 employees'
5. MS Project (Downloaded & Active) - Doug
6. Accountant Proposal (Waiting on Accountant to Propose Business Financial Business Structure)
7. Barclays Proposal Prior to Departure
8. Startup Funds (Most equipment is Already Purchased for CFI/e-Discovery) However, we will need some additional investment.
9. NDA (Will Forward for Review)
10. Letter of Engagement (Client Agreements) – We need to customize this for the Business; but lawyers created.
11. Non-Competitive Agreement – Needs Customization
12. Travel Policy
13. Salesman – 50k pound salary + appx 10% estimate.
14. Services Initially Available (Forensics, Limited e-Discovery, Advanced Data Recovery, High-tech Investigations, Pen Testing, etc.)
15. Financial Accounts Created - Ferrante
16. Introduction to the Graphic Designers – Ferrante
17. Web Design – Doug Lead, Ferrante Backup
18. Agreement for Employee Share Plan – Accountant
19. Additional FTE's Required – (Further discussion)
20. Potential Executives (Sean Catlett, etc)

Please add or delete from this as you see fit...

One point I would like to keep between us is the discussion around me leaving. I want to have a conversation with Peter Troy to see if I can bide more time working in the US while we work out complete business plans. If not, I am ready to go. I do not want information relating to me leaving being disclosed to Bob. I will have a sit down with Bob to see if he is going to be fully committed to the business or not.

Best,
Matthew

# EXHIBIT 2



D0ug F3rgus0n7 <yow777@gmail.com>

**business costs**

**Matthew D. Ferrante** <mferrante@auroracfi.com>  Mon, Jul 12, 2010 at 4:10 AM
Reply-To: mferrante@auroracfi.com
To: D0ug F3rgus0n7 <yow777@gmail.com>

Doug,

You have my support, dedication and loyalty for the business. Almost all of this I have covered.

It is almost ready to launch. We just need the wording to put into the final ink.

Best,
Matthew

Sent from Aurora Information Security & Risk BlackBerry
AuroraCFI.com

**From:** D0ug F3rgus0n7 <yow777@gmail.com>
**Date:** Sun, 11 Jul 2010 17:21:18 +0100
**To:** Matthew D. Ferrante<mferrante@auroracfi.com>
**Subject:** business costs

so, matt, a huge benefit you can bring to the cost model is:

- website costs
- business internet connection costs
- email hosting costs
- call centre costs
- marketing and PR costs
- phone / conference costs
- meeting space costs
- legal costs
- incorporation costs
- insurance costs

that would really help out. you likely only have some of that but anything will do.
we need to know what it will cost, and when, to run this thing.

# EXHIBIT 3



**Aurora's expertise is demonstrated by our leadership**

"A clever fighter is one who wins, but wins with ease" — Sun Tzu

Overview | Benefits | Leadership | Corporate Philosophy

**Our principals have the background and experience to ensure success.**

**Matthew Ferrante**

Matthew is a co-founder of Aurora Information Security & Risk™, where he leads its North American operations and heads Aurora CFI/e-Discovery™. Prior to Aurora, Matthew was with Barclays Bank in London, where he founded Barclays CFI/e-Discovery and was its first director. Before Barclays, Matthew was a Special Agent with the United States Secret Service. He has served on President Clinton's protection detail, US Critical Infrastructure, and several successful high profile, high-tech investigation operations. Matthew has an extensive background in physical and network infrastructure protection, with specialties in global enterprise class environments, protective intelligence, threat assessments, international organized crime, e-crime, forensics, breach investigations, extreme hacking, data leakage, fraud, employee misconduct, cyber stalking, and asset identification. He has successfully testified in US Federal Courts and is considered by federal districts as an expert in his field. Matthew was educated at the United States Secret Service Academy, Federal Law Enforcement Training Center, Electronic Crimes Special Agent Program, and Mercy College for Criminal Justice. Now based in New York City, he is a US citizen.

**Douglas Ferguson**

Douglas is a co-founder of Aurora Information Security & Risk™, where he is responsible for European operations, Aurora e3™, and strategy and assurance architecture. Prior to Aurora, Doug was with Barclays Bank in London, where he was Global Head of Security Controls Assessment, Penetration Testing, and Firewalls, and delivered services to clients in more than 30 countries. Previously, Doug was a Managing Consultant at Internet Security Systems, which was subsequently purchased by IBM. While at IBM/ISS, Doug was a member of the acclaimed ISS "X-Force" research and development team, and developed extensive skills in critical infrastructure, SCADA, control strategy, design and implementation, and information security governance. He was co-creator of the breakthrough System Scanner technology. Doug's early experience in the information security industry was with the Royal Canadian Mounted Police. A featured speaker at numerous industry conferences, Doug was educated in Computer Sciences at the University of Waterloo, in the heart of Canada's Technology Triangle. Based in London, he is a Canadian national with dual citizenships: Canada and the United Kingdom.

Find out more about our track record and what drives us as an organization. Contact us for

# EXHIBIT 4



**AURORA**™
Information Security & Risk

DOUGLAS FERGUSON
Co-Founder/Managing Director
Information Security & Strategic Designs

T +44 (0)20 7979 7721  Toll Free 800.470.0988
dferguson@aurora-cti.com

**AURORA**™
Information Security & Risk

DOUGLAS R. FERGUSON
Co-Founder

dferguson@aurorasecurity.com



**AURORA**™
Information Security & Risk

MATTHEW D. FERRANTE
Co-Founder

mferrante@aurorasecurity.com

US:    +1 212.537.9397    US Toll Free: +1 800.470.0988
UK: +44 207.979.7721

45 Rockefeller Center       271 Regent Street
630 Fifth Avenue, 20th Fl.   London, UK
New York, NY 10020          W1B 2ES

AURORASECURITY.COM

# EXHIBIT 5

*\<Skype logs – August 9th, 2010\>*

[09/08/2010 10:17:58] Matthew: let me start with the legal paperwork to send you
[09/08/2010 10:18:03] Douglas Ferguson: ok, great
[09/08/2010 10:18:06] Matthew: I owe the lawyers some money
[09/08/2010 10:18:12] Douglas Ferguson: keep your receipts
[09/08/2010 10:18:14] Douglas Ferguson: ;)
[09/08/2010 10:18:19] Matthew: so, I can see if they delivered everyting on their side
[09/08/2010 10:18:29] Matthew: then I will ask for a quote to have you added as a partner
[09/08/2010 10:18:39] Matthew: we can do this still as an LLC
[09/08/2010 10:18:48] Matthew: with Phantom stock was the lawyers recommendation
[09/08/2010 10:18:51] Douglas Ferguson: actually, from a share perspective we need to discuss that
[09/08/2010 10:18:54] Matthew: so, please research it
[09/08/2010 10:19:18] Matthew: yes, I am happy to discuss it whenever you are
[09/08/2010 10:19:25] Matthew: let's remain very open
[09/08/2010 10:19:32] Douglas Ferguson: both our neames need to be on the company formation docs
[09/08/2010 10:19:35] Matthew: and we can discuss specifics
[09/08/2010 10:19:43] Matthew: lol; agreed
[09/08/2010 10:19:46] Douglas Ferguson: our licensings dox - or what they are called
[09/08/2010 10:19:49] Matthew: cause right now it's only Dianas
[09/08/2010 10:19:58] Douglas Ferguson: yeah, so she's actually the only owner
[09/08/2010 10:19:59] Douglas Ferguson: lol
[09/08/2010 10:20:14] Matthew: she knows she can run...but she can't hide
[09/08/2010 10:20:19] Douglas Ferguson: brad, who is ceo of clearskies told me
[09/08/2010 10:20:35] Douglas Ferguson: that regardless of our stock options - if you name isn't on the license you are at a disadvantage
[09/08/2010 10:20:50] Matthew: well; we get you added as a member
[09/08/2010 10:20:59] Douglas Ferguson: i can setup a call with my lawyer as well to discuss this stuff
[09/08/2010 10:21:03] Douglas Ferguson: he's a really cool guy
[09/08/2010 10:21:05] Matthew: let me work out the legal docs for the business
[09/08/2010 10:21:09] Douglas Ferguson: haven't talked to him in a few years tho
[09/08/2010 10:21:18] Matthew: then we can setup a conference call with the attorneys
[09/08/2010 10:21:21] Douglas Ferguson: cool
[09/08/2010 10:21:36] Matthew: cause first thing he is going to say is you have an outstanding bill
[09/08/2010 10:21:40] Matthew: which I have the money
[09/08/2010 10:21:50] Matthew: but; before I pay I want to make sure its accurate
[09/08/2010 10:21:55] Matthew: and that they fully delivered
[09/08/2010 10:22:01] Matthew: so, no problems
[09/08/2010 10:22:10] Douglas Ferguson: no worries - get the dox in order
[09/08/2010 10:22:18] Matthew: alright; leave skype up

# EXHIBIT 6

**From:**        Matthew D. Ferrante [mferrante@auroracfi.com]
**Sent:**        Monday, August 09, 2010 11:44 PM
**To:**          'Douglas Ferguson'
**Subject:**     Trademarks, Patents, etc.

Doug,

Do you want any estimates for any legal work, e.g. trademarks & patents? Let me know...

FYI...I already have a quote to edit the AISR LLC partnership agreement at $1,500. I am certain that this is a low end estimate. In addition, they will be doing the UK end of the "LLC". At a minimum, they are reserving the name "Aurora Information Security & Risk" & "Aurora CFI/e-Discovery."

**Matthew  D. Ferrante**
Co-Founder
Executive Director
Aurora Information Security & Risk™
Aurora CFI/e-Discovery™
(212) 537-9397
(800) 470-0988 [USA]
+44 (0)20 7979 7721 [Europe]
MFerrante@auroracfi.com
www.auroracfi.com
**Asia · Africa · Europe · NSC America · Australia**



This email & it's contents are the property of Aurora Information Security & Risk™.
The contents are confidential and/or legally privileged. Unauthorized access, disclosure, duplication, reproduction, forwarding and/or dissemination in whole or in part is strictly prohibited without the appropriate & direct consent of Aurora Information Security & Risk™.

# EXHIBIT 7

**From:** Matthew D. Ferrante [MFerrante@aurorasecurity.com]
**Sent:** Wednesday, November 24, 2010 1:01 AM
**To:** 'Douglas Ferguson'
**Subject:** RE: USD funds

Doug,

No problem, a check is fine. Core upcoming expenses are as follows:

Graphic Design
**\*Website Estimate: $10,529**
\*This was an original quote. I expect this to be higher. However, Joao was told that he must get approval before exceeding any budgets. We must minimize his use as much as possible...this is why I really want to get the website out of the way.

**\*\*Brochures:  Sales Brochure $1,665** + Sell Sheets $1,740 + Executive Brochures $3,000 = $4,905
\*\*These do not include copywriting, photo royalty fees (if needed) and more importantly printing.

**Copywriter Estimate: $2,500** - $3,500

**Legal Fee Estimate: $4,100** (Operating Agreements, Trademarking, LTD Creation)

**\*\*\*Business Cards: $450** - $550
\*\*\*I suggest we order new business cards here in the US. You can pick them up when you arrive.

**Misc.** (Merchant Services, DaVinci, Shipping, Accounting, UK LTD filing Fees, etc.) $1,500

Estimated Upcoming Expenses: $20,744 to $28,184


The Aurora website completion with minimal delay is absolutely essential. Once this is online, I strongly believe we can quickly regenerate capital using our current stationary & mailings, Aurora 360, 1099 employees and equipment on hand.

Best,
Matthew

---

**From:** Douglas Ferguson [mailto:dferguson@aurorasecurity.com]
**Sent:** Tuesday, November 23, 2010 11:43 AM
**To:** 'Matthew D. Ferrante'
**Subject:** USD funds

> Old Signed: 11/23/2010 at 11:43:31 AM, Decrypted

Looks like our USD account isn't setup for wire transfers. We'll FedEx you a check tomorrow. Cool?

What should I send? $5k? More? Being practical about it. ☺

**Douglas R. Ferguson**

Co-Founder
Aurora Information Security & Risk™
+44 (0)777 159 0970 [Mobile]
+1 800 470 0988 [USA]
+44 (0)20 7979 7721 [Europe]
dferguson@aurorasecurity.com
www.aurorasecurity.com
**Asia · Africa · Europe · NSC America · Australia**



This email & it's contents are the property of Aurora Information Security & Risk™.
The contents are confidential and/or legally privileged. Unauthorized access, disclosure, duplication,
reproduction, forwarding and/or dissemination in whole or in part is strictly prohibited without the
appropriate & direct consent of Aurora Information Security & Risk™.

* Douglas Ferguson <dferguson@aurorasecurity.com>
* 0x1949FBC7

# EXHIBIT 8

From:           Matthew D. Ferrante (AURORA) (mferrante@aurorasecurity.com)
Sent:           Tue 8/23/2011 11:24 AM
Rcvd:           Tue 8/23/2011 11:25 AM
To:             Douglas Ferguson (dferguson@aurorasecurity.com)
CC:
BCC:
Subject:        RE: Aurora Financials - proposed lease

========================================

 My original request was for you to review a lease. Disregard the original request as this has totally
digressed.

I consider our finances not in order when you and I were struggling to pay our own salaries. Banu was
paying for you, Diana was helping to pay me. I have a family to feed. As discussed, we are both in a
positive direction and this is now much less of a risk. We both did financial projections for the year
contained in the spreadsheets. Those goals are set and I am working to achieve them, minimizing
expenses as much as possible. However, as discussed a location is now required for projects like bream,
guidepost, and the law firms. My electricity bill alone would be reduced to help offset the cost of the
facility which includes power. Much of this is common sense...

Regarding, the bullet points we discussed they are being addressed. Again, disregard the request to
review a lease.

I dont need a reply, I understand your email and your concerns.

-----Original Message-----
From: Douglas Ferguson
Sent: Tuesday, August 23, 2011 10:06 AM
To: 'Matthew D. Ferrante (AURORA)'; dianaqf@aurorasecurity.com; 'Aurora Finance'
Subject: RE: Aurora Financials - proposed lease

Matt,


Are you asking me to commit (immediately in email) to a black box of unknown
business and financial plans and current financial status?


Does that seem fair?


I'm not against committing to the expenses for CFI/Aurora as long as you can
present to me the business and financial case, and current financial status
(in detail as per my prior email). Without these, there is nothing to commit
to. If you have these, please email or direct me to them.

Finances, at this very moment, should be in order. Thus, they should be immediately available for my review. If they are not immediately available, this is indicative of a weakness in the business & financial plan & operations. Which in its own, tells us to 'slow down' and catch up on the plan/foundation.

If you don't agree with above, we must get together and discuss our options.

I trust this is pragmatic,

Doug

From: Matthew D. Ferrante (AURORA) [mailto:mferrante@aurorasecurity.com]
Sent: 23 August 2011 14:15
To: Douglas Ferguson; dianaqf@aurorasecurity.com; 'Aurora Finance'
Subject: RE: Aurora Financials - proposed lease

Doug,

1. Need space for lab, eg chain of custody issues, electricity (my house will not be able to support demand), physical documents becoming too large, cfi will require physical handling of evidence and dismantling of e-evidence.

2. We are still on target to meet or exceed our yearly projections outlined in the business plan spreadsheets. Currently, for 2011 have grossed about 90k. I already explained that my previous expenses for equipment were about 50k.

I need you to immediately confirm via email that you are committed at this point to the profits of cfi as well as to the expenses? If you are not yet commited because you want detailed justifications, that's totally cool; but I will assume that you have no risk and no CFI split. I already estimated these for you at around 50k. If you want details, that's fine but it will take me time to go through and itemize which will be done anyway for reimbursement. I just want to be sure where you stand so there is no confusion. From the beginning, i was committed to everything you were doing. I just need a simple 'yes' or 'no'. I am not going to take all the risk with my capital, then divide all the profits CFI makes. Absolutely no pressure, just want to be sure where cfi stands. I am completely and totally cool with either way.

Best,
Matthew

_____

From: Douglas Ferguson
Sent: Tuesday, August 23, 2011 5:49 AM
To: 'Matthew D. Ferrante (AURORA)'; dianaqf@aurorasecurity.com; 'Aurora Finance'
Subject: Aurora Financials - proposed lease

Matt,


Please provide the following prior to consideration of a lease. Thanks!


1.      What is the business justification for this space?

2.      What is the current (and forecast) financial state of the business?

o   All income to date, trends, forecasts

o   All costs to date, trends, forecasts

o   All debts against the business

o   Any debts you intend to recoup (in any way) from the business



Douglas R. Ferguson

Co-Founder

Aurora Information Security & RiskT

271 Regent Street

London, UK

W1B 2ES

+44 207 979 7721 [Europe]

+1 800 470 0988 [USA]

 <mailto:dferguson@aurorasecurity.com> dferguson@aurorasecurity.com

 <http://www.aurorasecurity.com/> www.aurorasecurity.com

Asia · Africa · Europe · Americas · Australia

Aurora CFI e-Discovery Logo.bmp

This email and its contents are the property of Aurora Information Security
& RiskT.

[The entire original message is not included.]


[The entire original message is not included.]

# EXHIBIT 9

REDACTED

-----Original Message-----
From: dianaqf@auroracfi.com [mailto:dianaqf@auroracfi.com]
Sent: 04 October 2011 18:11
To: Douglas Ferguson
Subject: Re: Wire

Got it thanks.

------Original Message------
From: Douglas Ferguson
To: dianaqf@auroracfi.com
Subject: RE: Wire
Sent: Oct 4, 2011 12:58 PM

Diana,

Let me know if the above is what you need and makes sense. If you need
anything else just let me know!

Thanks!
Doug

My current account:
Account name: Mr Douglas Ferguson
Account number:
Sort:
IBAN:
Swift:

Branch: Dockland
2 Churchill Place
Canary Wharf
London
E14 5RB

My home address:
16 Leather Lane, Flat 3
London, UK
EC1N 7SU

-----Original Message-----
From: dianaqf@auroracfi.com [mailto:dianaqf@auroracfi.com]
Sent: 04 October 2011 17:04
To: dferguson@aurorasecurity.com

Subject: Wire

What is your home address and bank branch number and address?

Thanks!

Sent from my Verizon Wireless BlackBerry

# EXHIBIT 10

| | |
|---|---|
| *From:* | Douglas Ferguson (dferguson@aurorasecurity.com) |
| *Sent:* | Fri 9/30/2011 11:51 AM |
| *Rcvd:* | Fri 9/30/2011 11:51 AM |
| *To:* | Matthew D. Ferrante (AURORA) (mferrante@aurorasecurity.com) |
| *CC:* | |
| *BCC:* | |
| *Subject:* | McAfee payment? |

==========================================

 I know you and Diana are watching that accounts like a hawk. J
Today is the deadline for the funds transfer of £15,000 from McAfee to the Aurora
account.
I'm on fumes here, I've paid everybody else off, so definitely looking forward to the cash
infusion.
You have my Barclays UK account infos so just fire that stuff over when it arrives.

**Douglas R. Ferguson**
Co-Founder
Aurora Information Security & Risk™
271 Regent Street
London, UK
W1B 2ES
+44 207 979 7721 [Europe]
+1 800 470 0988 [USA]
dferguson@aurorasecurity.com
www.aurorasecurity.com
**Asia · Africa · Europe · Americas · Australia**
Aurora CFI e-Discovery Logo.bmp
This email and its contents are the property of Aurora Information Security & Risk™.
The contents are confidential and/or legally privileged. Unauthorized access, disclosure,
duplication,
reproduction, forwarding and/or dissemination in whole or in part is strictly prohibited
without the
appropriate and direct consent of Aurora Information Security & Risk™.

*From:*        Matthew D. Ferrante (AURORA) (mferrante@aurorasecurity.com)
*Sent:*        Mon 10/3/2011 01:37 PM
*Rcvd:*        Mon 10/3/2011 01:38 PM
*To:*          Douglas Ferguson (dferguson@aurorasecurity.com)
*CC:*
*BCC:*
*Subject:*     RE: McAfee payment to Aurora

========================================

 She did and will follow up with what they did in error. I will send the love!

**From:** Douglas Ferguson
**Sent:** Monday, October 03, 2011 12:54 PM
**To:** 'Matthew D. Ferrante (AURORA)'
**Subject:** RE: McAfee payment to Aurora
Ok, anything I can send back to McAfee so they fix their error?
Diana had said that there were some common errors on those wires - perhaps I can
pass those to the McAfee folks?

But, the good news is, she grabbed it, right? If so, give her a huge hug from Banu & I. J

**From:** Matthew D. Ferrante (AURORA) [mailto:mferrante@aurorasecurity.com]
**Sent:** 03 October 2011 17:49
**To:** Douglas Ferguson
**Subject:** RE: McAfee payment to Aurora

McAfee fucked up the wire. They did not follow the wiring instructions Diana sent. Diana
had to grab the wire.

**From:** Douglas Ferguson
**Sent:** Monday, October 03, 2011 12:32 PM
**To:** 'Matthew D. Ferrante (AURORA)'
**Subject:** RE: McAfee payment to Aurora
[The entire original message is not included.]